UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VALERIE HARDY-MAHONEY, Regional Director of the Thirty-Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board

Petitioner,

v.

EVERPORT TERMINAL SERVICES, INC., and INTERNATIONAL LONGSHORE AND WAREHOUSE UNION

Respondents.

Case No. 17-cv-00804-RS

**ORDER DENYING PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT**

## I. INTRODUCTION

Section 10(j) of the National Labor Relations Act (29 U.S.C. Section 160(j)), authorizes the National Labor Relations Board (the "Board") to petition a federal district court for interim injunctive relief pending the Board's final resolution of an unfair labor practice charge. Petitioner Valerie Hardy-Mahoney, in her capacity as the Regional Director of the Thirty-Second Region of the Board, seeks such relief here against respondents Everport Terminal Services, Inc., and the International Longshore and Warehouse Union, in connection with charges the Board is currently adjudicating regarding events that took place in 2015.

In light of the fact that the Board effectively requests an injunction returning circumstances to the status quo *ante* of well over a year ago, and given respondents' showing that their defenses are, at a minimum, not frivolous, the Board had failed to show that an injunction under section

10(j) is warranted. The petition will therefore be denied.

## II. BACKGROUND

There is little dispute as to the central facts.

*a. Historical context*

Since a 1938 settlement of longstanding labor strife in the West Coast longshore industry, the International Longshore and Warehouse Union ("ILWU") has been certified as the bargaining representative for a coast-wide bargaining unit covering all Pacific Coast ports. In most locations, this meant that the ILWU represented not only all longshore workers, but also employees engaged in so-called "maintenance and repair" work ("M&R").

Employers typically belong to the Pacific Maritime Association ("PMA") formed in 1949 by the merger of two earlier multi-employer associations. The PMA exists primarily to negotiate and administer agreements between its members and the ILWU.

In the 1960s, the "container revolution" brought intermodal containers with standardized dimensions, complete with cranes to lift those containers on and off vessels, thereby changing the nature of longshore work. At least in part because of those changes, some conflict arose between the ILWU and another union, the International Association of Machinists ("IAM"). Employees represented by the IAM had historically performed M&R work for trucks, tractors, mobile cranes, and other mechanical equipment in and around the ports. For the next forty years the ILWU and IAM apparently jockeyed for position to determine which would represent various categories of workers, as the nature of the jobs changed.

By 2008, ILWU had come effectively to claim jurisdiction over "longshore M&R work." Under a written agreement, however, some terminals were "red circled," whereby certain grandfathered exceptions supplanted ILWU jurisdiction over M&R work. Those exceptions existed where non-ILWU mechanics historically had provided M&R labor and had separate bargaining history with the specific terminal operator. The Ben E. Nutter Terminal at the Port of Oakland, the subject of the present controversy, was designated as a "red circled" exception,

because its M&R employees had historically been represented by IAM.

### b. Everport's acquisition of the Nutter Terminal operations

Dating to approximately 1968, the Nutter Terminal had been operated by Marine Terminals Corporation and/or Miles Motors Transport System (collectively "MTC"). In 2002, the Port of Oakland assigned the right to operate the Nutter Terminal to Evergreen Marine Corporation (Taiwan), Ltd. ("EMC"). Between 2002 and 2015, however, EMC, and later its wholly-owned subsidiary Everport, effectively continued to operate the terminal in conjunction with MTC, through a joint enterprise they formed known as "STS." The details of the transactions and the entities involved are not material, because it is not disputed that prior to December of 2015, the Nutter Terminal workers were employees of MTC or STS, and were represented by either ILWU or IAM, as appropriate for their positions. The current dispute involves only what happened after December of 2015 to those MTC employees who had been represented by IAM—the so-called "MTC Mechanics."

On July 30, 2015, Everport, which by then had been assigned EMC's rights, gave notice it was terminating the relationship with MTC/STS as of December 5, 2015, and that it would thereafter operate the Nutter Terminal itself. Weeks earlier, Everport had applied, and been approved, for membership in the PMA. The ILWU took the position that the "red circle" exception to ILWU jurisdiction over M&R work at Nutter Terminal would not apply once Everport assumed direct operation at the facility. Everport argues, in effect, that it had no real choice but to accept it had an obligation to hire M&R workers through the "joint longshore dispatch" procedures applicable to employers in the PMA, and employees represented by the ILWU. Everport asserts that in October and November of 2015, its attorneys had "several discussions" with counsel for the IAM union in which it advised that (1) it was obligated to hire through the ILWU-PMA Joint Dispatch Hall, and (2) it would not discriminate against any employee or union, and would consider applications from any of the former MTC mechanics.

*c. Everport's hiring.*

Everport subsequently looked to the ILWU-PMA Joint Dispatch Hall to fill twenty-seven so-called "steady" mechanic positions. It hired thirteen or fourteen employees. Then, it considered the MTC Mechanics to fill the remaining approximately thirteen slots. Everport asserts it ultimately interviewed all eighteen MTC Mechanics, made offers to fifteen, and employed thirteen, deciding not to hire only three who had applied. Plaintiff, in response, states that "a number" of MTC Mechanics remain unemployed, and that even those who accepted jobs under ILWU representation may have been disadvantaged in various ways.

*d. The Board proceedings*

On March 21, 2016, IAM filed a charge with the Board against Everport, alleging violations of sections 8(a)(1), (2), (3), and (5) of the National Labor Relations Act ("NLRA"). IAM alleged Everport refused to negotiate as a successor to MTC, discriminated against IAM members, and unlawfully recognized the ILWU as the bargaining agent for Everport's M&R mechanics.

The next day, the Board advised Everport it had "identified this case as one in which injunctive relief pursuant to Section 10(j) of the act may be appropriate." The following month, April of 2016, the Board again corresponded with Everport, advising it of the charges and warning that the Board had "decided that injunctive relief may be appropriate under section 10(j)." Everport was asked to submit a response, which it did, setting out why it believed section 10(j) relief would not be warranted.

Nearly eight months later, in December of 2016, the Board issued its underlying complaint. Even then, the Board did not file this section 10(j) petition for another eight weeks, until approximately the time the administrative trial was to begin.

### III.  LEGAL STANDARD

Although some circuits evaluate section 10(j) petitions with greater deference to the Board than is accorded to ordinary private litigants seeking preliminary injunctive relief, the Ninth Circuit has made clear that a section 10(j) petition is subject to substantively the same analysis as other requests for interim injunctions:

> Section 10(j) permits a district court to grant relief "it deems just and proper." 29 U.S.C. § 160(j) . . . . Thus, when a Regional Director seeks §10(j) relief, he [or she] "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).
>
> "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [Regional Director] can support issuance of a preliminary injunction, so long as the [Regional Director] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011).  In all cases, however, the Regional Director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Id*. at 1131 (emphasis omitted

*Frankl v. HTH Corp*., 650 F.3d 1334, 1355 (9th Cir.  2011).

### IV.  DISCUSSION

The Board insists that the liability of Everport and the ILWU is clear.  It argues that under *N.L.R.B. v. Burns Int'l Sec. Servs., Inc*., 406 U.S. 272 (1972) an employer succeeds to its predecessor's collective bargaining obligations if a majority of its employees, consisting of a substantial and representative bargaining unit, are former employees of the predecessor and if there is substantial continuity between the two enterprises.  Thus, the Board contends, Everport committed an unfair labor practice, in which ILWU participated, when it joined the PMA and thereby obligated itself to hiring through the ILWU, even before it had any employees.

In the Board's view, this was part of a deliberate "scheme" to avoid the obligations Everport had under *Burns* to negotiate with the IAM, and not to discriminate against IAM-

represented employees when hiring its own workforce. The Board points to the fact that Everport initially filled M&R positions through listings posted exclusively at the ILWU-PMA Joint Dispatch Hall. The Board also relies on allegations of some former MTC Mechanics who contend they were told during their interviews that Everport needed to ensure former IAM-represented workers constituted less than 50 percent of the new workforce.

Defendants do not challenge the Board's assertion that when a successor employer attempts to evade its *Burns* obligation to avoid negotiating with the prior union by discriminating against hiring a majority of employees represented by that union, it is appropriate to presume the employer otherwise would have hired those individuals. *See*, *Am. Press, Inc. v. N.L.R.B.*, 833 F.2d 621, 625 (6th Cir. 1987) ("An employer may not defeat a finding of successorship through its own discrimination.")

Nevertheless, it is far from clear that the Board has shown a likelihood of success on the merits. This certainly was not a circumstance where an employer was attempting to avoid having a unionized workforce, or any obligation to negotiate with unions.[1] While the Board's characterization that Everport was engaged in a "scheme" to avoid obligations under *Burns* is somewhat persuasive, so is the alternative narrative offered by Everport that it was merely attempting to act consistently with other West Coast terminal operators in abiding by its obligations as a member of the PMA.

Apart from any showing on the potential merits, however, the Board simply has not demonstrated how at this juncture additional irreparable harm is likely to accrue absent a ruling in its favor on this petition. The events alleged to have been wrongful took place in 2015. The Board was on notice of those facts almost exactly one year ago, and advised Everport it thought section 10(j) relief would be warranted the very next day. The petition in this court was not filed for some eight weeks after the underlying administrative complaint was filed. While there is some evidence a handful of MTC Mechanics may remain unemployed, the Board has not made a

---

[1] This is not to suggest that no unfair labor practice can ever exist where an employer favors one union over another.

ORDER DENYING INTERIM INJUNCTION
CASE NO. 17-cv-00804-RS

compelling showing of irreparable harm.

The Board relies on *Frankl*, *supra*, 650 F.3d 1334, and similar cases to argue that Board investigations necessarily take time and that some courts have issued injunctions under section 10(j) even where the Board had been aware of the allegations months before seeking relief under section 10(j).  On the record here, however, petitioner has not shown that a mandatory injunction, requiring respondents to attempt to restore a status quo *ante* of 2015 is warranted, under any showing on the merits the Board arguably has made.  The relief the Board seeks here is more appropriately granted—if at all—in the administrative proceedings, and not by a district court on an abbreviated record, especially where the irreparable harm, if any, has not been shown to be substantially increasing.

At the hearing, the parties suggested that the proceedings before the administrative law judge may be concluded in May of this year.  Accordingly, there appears to be a reasonable chance a determination at the initial administrative level will issue within the next several months.  Without prejudging the question of whether decision in the Board's favor would sufficiently alter the balance of equities as to warrant section 10(j) relief at that juncture, this decision is without prejudice to any new application by the Board, should that come to pass.

## V.  CONCLUSION

The petition under Section 10(j) of the National Labor Relations Act is denied.  The Clerk of the Court is directed to close the file.  In the event the parties contend further proceedings are necessary, and/or that a separate judgment should be entered to permit appeal, they may so advise the Court in a joint filing, or in separate filings following meet and confer negotiations.

**IT IS SO ORDERED**.

Dated:  March 23, 2017

_____
RICHARD SEEBORG
United States District Judge